**William Z. HUGHES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 95–CF–636.

District of Columbia Court of Appeals.

Argued Nov. 6, 1996.

Decided Feb. 27, 1997.

Michael E. Canode, appointed by this court, Springfield, VA, for appellant.

Andrew C. Phelan, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher and Thomas C. Black, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and REID, Associate Judges, and MACK, Senior Judge.

REID, Associate Judge:

After a jury trial, appellant William Z. Hughes was convicted of first degree burglary while armed, in violation of D.C.Code §§ 22–1801(a), –3203 (1996 Repl.); assault with a dangerous weapon, in violation of D.C.Code § 22–502; possession of a firearm during a crime of violence, in violation of D.C.Code § 22–3204(b); carrying a pistol without a license, in violation of D.C.Code § 22–3204; and simple assault, in violation of D.C.Code § 22–502. Hughes filed a timely appeal. He contends that (1) he was denied his Sixth Amendment right to a fair trial by an impartial jury; (2) he was denied due process because of the introduction of "other crimes" evidence; and (3) the evidence was insufficient to convict him beyond a reasonable doubt. We reverse and remand the case for a new trial.

**I.**

The right to trial by an impartial judge or jury is fundamental and deeply embedded in American jurisprudence. In *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), the Supreme Court stated that, "[t]he constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.'" (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)). Indeed, "[n]o matter how strong [the] evidence [against the accused, and even if it is] 'exceptionally strong,' [the accused has] a constitutional right to have it passed on by an impartial jury." *Dennis v. United States*, 339 U.S. 162, 175, 70 S.Ct. 519, 527, 94 L.Ed. 734 (1950) (Black, J., dissenting). The mandate of fairness is rooted in the Sixth Amendment to the Constitution, which specifies that an accused "shall enjoy the right to ... trial, by an impartial jury."

In 1950, Justice Felix Frankfurter reminded us that, "[t]he constitutional command for trial by an 'impartial jury' casts upon the judiciary the exercise of judgment in determining the circumstances which preclude that free, fearless and disinterested capacity in analyzing evidence which is indispensable if jurymen [and jurywomen] are to deal impartially with an accusation." *Dennis, supra*, 339 U.S. at 181, 70 S.Ct. at 525 (Frankfurter, J., dissenting).[1] Moreover,

1. Justice Jackson expressed the view in *Dennis,* that "[t]he right to fair trial is the right that

the majority in *Dennis* recognized that, "[i]mpartiality is not a technical conception. It is a state of mind." *Id.* at 172, 70 S.Ct. at 523 (citation omitted). In that regard, "the juror's assurances that he [or she] is equal to [the] task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of ... an opinion in the mind of the juror as will raise the presumption of partiality.' " *Murphy, supra,* 421 U.S. at 800, 95 S.Ct. at 2036 (quoting *Irvin, supra,* 366 U.S. at 723, 81 S.Ct. at 1642–43).

## II.

██ Here, on two occasions, Juror No. 1 signaled to the trial court that he questioned his own state of mind regarding his ability to be fair, fearless and disinterested in examining evidence against Hughes. First, during the *voir dire,* he conscientiously summarized his contacts and past working relationships with persons in law enforcement, including those in the U.S. Attorney's Office for the District of Columbia. In response to a question from the government attorney, he indicated that he had served as a law clerk to a federal appellate court judge and that "in general the prosecutors ... [in criminal] cases did bang up jobs and the defense lawyers did not do very good jobs." He added, "I'm not saying that I ever saw you [defense counsel] do a bad job, but my general sense is that the work was more professional on the Government's side." When asked whether his belief regarding prosecutors and defense counsel "[would] ... have a tendency to affect [his] outlook on the determination as to guilt or innocence of a particular individual," Juror No.1 responded in part, "I mean not necessarily the guilt or innocence." When the government attorney inquired again, a few minutes later, whether "any of [the juror's] experiences either as an attorney or as a clerk in dealing with criminal matters ... cause [him] to be unable to be fair and impartial in the determination of guilt or innocence," he stated,

I would never want to say I'm unable to be fair or impartial, but I should tell you that for the past five months I have been on leave from my law firm and have been working on the White House security review, which is a special group put together under the Secretary of the Treasury ... for enforcement to investigate the various incidences that have happened at the White House.

My colleagues in that group are two ... Assistant U.S. Attorneys, including one who recently left this office, the D.C. office, named Elizabeth Breese, and two former federal prosecutors in addition to that.

And in the course of that review, which was sort of an investigation but also an investigation with the Secret Service, that worked in close conjunction with the Secret Service, both agents and officers of the Uniformed Division, officers who had contact with MPD, had contact with the FBI and also had, not direct contact, but reviewed the work of Park Police to some degree, and also to the degree that one of the incidences that took place was a life matter, which was the Duran shooting at the White House, my group worked in conjunction with the U.S. Attorney's Office in order to preserve the integrity of that case.

So my general—I should tell you that for the past five months I have been working closely with people on the law enforcement side of things and in general had a much more, you know, much more favorable view of the whole process than maybe I would have before.

When asked whether he had an opinion of Ms. Bresee, Juror No. 1 replied, "I think that I trust her.[2] I mean she has become a good friend. I trust her completely and don't believe she would ever do anything dishonest or untowards as a U.S. Attorney, although she has left the office now." Defense counsel posed no questions to Juror No. 1, but moved to strike him on the ground that "he gave me the impression that he would be just a little

stands guardian over all other rights." 339 U.S. at 173, 70 S.Ct. at 524 (Jackson, J., concurring).

**2.** The correct spelling of Ms. Breese's name, as indicated on a certificate of service found in the record is "Bresee." We have retained the spelling that appears in direct quotes from the record.

bit biased." The trial judge denied the motion, stating that the juror "said that he felt he could be impartial."[3] Defense counsel did not use any of his peremptory challenges to strike Juror No. 1, even though he was seated first in the jury box.

The second occasion on which Juror No. 1 signaled to the trial court that he questioned his own ability to "lay aside his impression or opinion[s]," *Irvin, supra,* 366 U.S. at 723, 81 S.Ct. at 1643, and his own impartiality, occurred while trial was in progress. As the first day of the trial ended, and following the testimony of Reginald Collier, a government witness who mentioned Ms. Bresee's name during redirect examination, Juror No. 1 apparently asked to speak with the trial judge.[4] He was invited to the bench and conveyed his physical reaction to his state of mind or psychological condition:

My heart is skipping a little bit here. Part of the defense theory seems to be that the prosecutors may have inserted words into the witness' mouth and one of the prosecutors is a close friend of mine, Elizabeth Breese, and in terms of my objectivity I don't feel I'm—I mean I absolutely refuse to accept that that may have been done.

The trial court responded, "Thank you. I will ask you to keep an open mind and hear all of the evidence and come to your conclusions." The juror did not state that he would, or would be able to, keep an open mind. Instead, he said, "I just thought I had to tell you." The trial court replied, "I appreciate that. Any questions for this gentleman before he leaves?" Defense counsel stated, simply, "no." During an additional brief dialogue between the counsel and the trial court, defense counsel still made no move to strike Juror No. 1 for bias. No further testimony was taken on the first day of the trial.

At the beginning of the second day of trial, defense counsel told the trial judge, "I want to—that last juror that ... came up and talked about the fact that he knew Ms.

Breese and that he had palpitations, I want to get him out of there for cause. It bothers me. We can have one of the alternates take his place." When the trial judge asked whether there was "any objection," the prosecutor said "yes" based upon his *voir dire* questioning of the juror, his understanding that the juror "indicated clearly that he could follow the court's instructions and would do so and that he would set aside whatever feelings he has." Defense counsel insisted that circumstances had changed since the *voir dire:*

There wasn't a problem originally during the voir dire, your Honor. I thought, when he said that he could handle it, that there wasn't a problem, but when he got up there Friday and said that he had palpitations of the heart and he was getting very, very uncomfortable, that bothered me. That means that something has triggered something and I just think there's cause to have him removed.

Defense counsel agreed with the trial court that the jury would not "be called upon to make any assessment of Ms. Breese or her conduct." However, defense counsel maintained that since the prosecuting attorney was "taking over [Ms. Bresee's] case that she worked so hard on and he is working so hard on ... there may be a bit of feeling that—that he will have a feeling towards—a good feeling towards the prosecution as against the defense attorney and the defense case." After reminding defense counsel that "I think we explored those during *voir dire* in the jury room," the trial court denied "the request to strike the juror for cause."

### III.

Understandably, the trial court was concerned with repeated delays in the trial of Hughes and the costs involved in his trial. Moreover, the trial court obviously weighed the fact that defense counsel had not used a peremptory strike against Juror No. 1, even though he was the first juror to be seated. Indeed, we cannot fault the trial judge for

---

3. The record does not reflect an explicit and unequivocal statement from Juror No. 1 that he could be impartial despite his legal experiences.

4. On redirect examination, Mr. Collier was asked, "Did Ms. Breese tell you to say anything in terms of what happened? Did she put any ideas into your head as to what happened?" Mr. Collier replied, "No, she didn't."

refusing to strike Juror No. 1 during the *voir dire*, simply because he had worked with law enforcement officials. Nonetheless, the early signal of potential problems with Juror No. 1's impartiality served as a reminder of the need for the trial court to be "ever watchful to prevent prejudicial occurrences ... when they happen." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982).

In *Allison v. United States*, 451 A.2d 877 (D.C.1982), we said we " 'should not reverse the trial judge's decision [as to whether to strike a juror] ... unless the juror's partiality is manifest.' " *Id.* at 879 (quoting *Wilburn v. United States*, 340 A.2d 810, 812 (D.C. 1975)). However, we also stated "that '[o]nly by a punctilious regard for a suspicion of prejudice can we hope to maintain the high tradition of our jury system. We must make sure that the lamentations of the unsuccessful litigant [are] without foundation, either in fact or circumstance.' " *Id.* (quoting *United States v. Chapman*, 158 F.2d 417, 421 (10th Cir.1946)).

### IV.

We conclude that the failure of the trial court to grant defense counsel's request to strike Juror No. 1 and replace him with an alternate juror, or to reopen the *voir dire* to determine whether actual bias existed, constituted a structural error requiring reversal of Hughes' conviction. It is a structural error because Juror No. 1 clearly was not impartial, but manifested, even through physical symptoms of heart palpitations, his definite bias in favor of the government. "[S]tructural defects in the constitution of the trial mechanism ... defy analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991); *see also Lyons v. United States*, 683 A.2d 1066, 1070 (D.C. 1996). The Supreme Court concluded in *Fulminante* that a trial conducted by a judge who is not impartial is a "structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably

serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " 499 U.S. at 310, 111 S.Ct. at 1265 (quoting *Rose v. Clark*, 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3105–06, 92 L.Ed.2d 460 (1986)). In addition, in *Rose*, the Supreme Court stated clearly, "[h]armless-error analysis ... presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." *Id.* at 578, 106 S.Ct. at 3106.

Juror No. 1 manifested prejudice in favor of the government when, finding his "heart skipping a little bit here," he told the trial court that a former Assistant U.S. Attorney who had worked on Hughes' case is "a close friend of mine," and that he "absolutely refuse[d] to accept" that "the prosecutors may have inserted words into the witness' mouth." [5] These words were not indicative of an open mind. Hence, the trial court should have replaced Juror No. 1 with one of the alternate jurors or, at least should have had "a punctilious regard for a suspicion of prejudice." *Allison, supra,* 451 A.2d at 879. A suspicion of prejudice should have prompted the trial court, at a minimum, to re-open the *voir dire* to determine whether actual bias existed. *See Artisst v. United States*, 554 A.2d 327, 331 (D.C.1989). When the trial court asked Juror No. 1 "to keep an open mind and hear all of the evidence and come to your conclusions," Juror No. 1 merely said, "I just thought I had to tell you." This response could hardly erase a suspicion of prejudice, or refute the presence of manifest prejudice. Yet, the trial court made no effort to question Juror No. 1 after defense counsel moved on the second day of trial to strike him for cause, and after the juror did not assure the trial court that he could and would keep an open mind. Nor did the trial court ask to review Juror No. 1's response to questions posed during the *voir dire*, in particular his statements that (1) when he served as a law clerk to a federal appellate court judge, he thought "in general [that] the prosecutors ... [in criminal] cases did bang up jobs and the defense lawyers did not do

---

**5.** During *voir dire*, Juror No. 1 described Ms. Bresee as "a good friend."

very good jobs;" (2) he "would never say I'm unable to be fair or impartial, but ... for the past five months I have been working closely with people on the law enforcement side of things and in general had a much more ... favorable view of the whole process than maybe I would have before."

In short, the record does not reflect any explicit or unequivocal statement from Juror No. 1 that he could be a "fair, fearless and disinterested" juror. Rather, it reflects Juror No. 1's favorable view of law enforcement officials, his close friendship with a former Assistant U.S. Attorney who worked on the Hughes' prosecution before she left the U.S. Attorney's office, and his close working relationship with law enforcement officials during the five months preceding the Hughes' trial. Ten government witnesses were presented at trial and only two defense witnesses, including Hughes. Juror No. 1's decidedly favorable view of government attorneys, his close working relationship with law enforcement officials, and his physical reaction to even a suggestion of impropriety by an Assistant U.S. Attorney, undoubtedly demonstrate that he was predisposed to believe the testimony of the ten government witnesses. Given these circumstances, the fact that he never gave the trial court explicit assurance that he could view the evidence with an open mind is telling. The conclusion is inescapable that the presence of Juror No. 1 in the jury box denied Hughes "the right to ... trial, by an impartial jury," guaranteed by the Sixth Amendment to the Constitution.

Viewed in the light most favorable to the government, the evidence was sufficient to support each of Hughes' convictions. *See Parker v. United States,* 601 A.2d 45, 51 (D.C.1991). Nonetheless, because of our conclusion with regard to the juror bias issue, a new trial is essential.

Accordingly, we are constrained to reverse the judgment of the trial court and remand with instructions to grant Hughes a new trial.[6]

*Reversed and remanded.*

6. Because of our reversal and remand, we do not reach the issue raised by Hughes regarding the

SCHWELB, Associate Judge, dissenting:

I am unable to agree with my colleagues that Hughes' convictions should be reversed. I acknowledge that this is a close case, and I agree with much that Judge Reid has written. In my opinion, however, Hughes is in no position to complain on appeal that the trial judge failed to pose questions to Juror No. 1 when, at trial, defense counsel was invited to propound questions to the juror but declined to do so. In addition, I think we owe more deference to the assessment of Juror No. 1 by the trial judge, who had a superior opportunity to appraise the many intangibles that do not find their way into a transcript. Accordingly, I respectfully dissent.

I.

The majority acknowledges that the judge did not abuse his discretion when he denied the defense's challenge for cause against Juror No. 1 during the initial *voir dire.* Even if there had been error at that time, there was no prejudice, for Hughes had the opportunity to exercise a peremptory challenge against the juror. Instead, the defense "passed" on two rounds, leaving Juror No. 1 on the jury.

A more difficult issue arose during the trial, when Juror No. 1 told the judge that "[m]y heart is skipping a little bit here." This comment was precipitated by the juror's impression that "part of the defense theory seems to be that the prosecutor may have inserted words into the witness' mouth." Based on his friendship with former prosecutor Elizabeth Bresee, the juror "absolutely refuse[d] to accept that that may have been done."

After Juror No. 1 had made this statement, the judge asked counsel for the parties if they wished to question the juror. Significantly, neither attorney posed any questions, and the judge was not asked to propound any. In fact, both parties appeared to be satisfied with Juror No. 1. The prosecutor

introduction of "other crimes" evidence.

argued that defense counsel had not challenged this juror and that the defense had "chosen to attack the credibility *of the parties involved*," as distinguished from the integrity of the prosecutor. Defense counsel stated: "My responsibility, your honor." The meaning of this comment is not clear, but Hughes' attorney was apparently indicating that it was his job to object if the juror was not satisfactory to the defense, and that he was not objecting. The court then adjourned for the weekend.

When trial resumed on the following Monday, Hughes' attorney announced that he had changed his mind, and he now asked the judge to discharge Juror No. 1 for cause. The judge demurred, noting that "thus far, there has been no evidence that I'm aware of to put Ms. Bresee's conduct at issue." He added that "I don't think [the jurors are] going to be called upon to make any assessment of Ms. Bresee or her conduct." Hughes' attorney responded: "I don't think they will either. . . . [W]e're not even stating that [Ms. Bresee] did anything wrong." Counsel based his challenge, instead, on the concern that, on account of Juror No. 1's friendship with Ms. Bresee, "there may be a bit of feeling that—that he will have a feeling towards—a good feeling towards the prosecution as against the defense attorney and the defense case." The judge denied the challenge for cause, commenting that he had previously explored during *voir dire* the question whether Juror No. 1 could be impartial.

### II.

Juror No. 1 made it clear that he did not believe that Ms. Bresee would put words into a witness' mouth or do anything dishonest. At one point, he indicated that he believed that the defense might try to show that Ms. Bresee had done something wrong. I agree that if Ms. Bresee's integrity had in fact been challenged by the defense, then retention of Juror No. 1 on the jury would have been impermissible, for the juror had plainly pre-

judged any such issue in the prosecution's favor. In fact, however, the defense never impugned Ms. Bresee's probity, and defense counsel explicitly denied in open court that Ms. Bresee's conduct was at issue.

Juror No. 1's statement of concern relating to Ms. Bresee left unanswered the question whether he could be impartial if Ms. Bresee's integrity was not being challenged. My colleagues in the majority appear to concede that this question had not been conclusively resolved, for they criticize the trial judge for not looking into the matter further. Specifically, they argue that the "suspicion of prejudice" which the juror's remarks had created "should have prompted the trial court, at a minimum, to reopen the *voir dire* to determine whether actual bias existed." My colleagues go on to find error because the judge "made no effort to question Juror No. 1 after defense counsel moved on the second day of trial to strike him for cause," and because he "did not ask to review Juror No. 1's response[s] to questions posed during the *voir dire.*"

It is here that I must part company with the majority. After Juror No. 1 conscientiously reported his concerns to the court, the judge asked the attorneys if they wished to question the juror. Hughes' counsel thus had the opportunity to ask any legitimate question that he wished to ask. If counsel preferred not to interrogate a member of the jury, he could have requested the judge to do so. This option was open to him both on the Friday, when the juror reported his concerns, and on the following Monday, when counsel presented his challenge for cause. Nevertheless, perhaps for tactical reasons,[1] Hughes' attorney declined to avail himself of the opportunity. Under these circumstances, Hughes cannot be heard to complain, for the first time on appeal, that the judge did not propound questions to the juror. *See In re A.R.,* 679 A.2d 470, 477–78 & n. 11 (D.C. 1996), and authorities there cited.

---

1. The record does not disclose why Hughes' attorney failed to question the juror, or to ask the judge to do so, at the time he presented his challenge for cause. There was, however, a perfectly reasonable tactical reason for declining the judge's invitation. If Juror No. 1 had been asked whether he could be fair and impartial with Ms. Bresee's integrity out of the case, and if he had answered in the affirmative, the challenge for cause would almost certainly have failed.

## III.

A finding by the trial judge that a juror is impartial may be set aside only where his or her prejudice is "manifest." *Irvin v. Dowd,* 366 U.S. 717, 723–24, 81 S.Ct. 1639, 1642–44, 6 L.Ed.2d 751 (1961); *Wilburn v. United States,* 340 A.2d 810, 812 (D.C.1975). My colleagues apparently accept this proposition. See maj. op. at 1210. At the same time, they also appear to acknowledge that there was no "manifest" showing of prejudice on the part of Juror No. 1.

The majority's view that the judge was obliged to question Juror No. 1 further necessarily presupposes that on the record before the trial court, the issue of partiality remained open. If additional interrogation about the juror's impartiality (or lack thereof) was required, then the decision whether he should be removed for cause turned on his answers to the questions that the judge ought to have asked him. No purpose would be served by questioning a juror whose bias is "manifest."

In any event, the trial judge is accorded broad discretion in determining whether to excuse a juror for cause. *Wilburn, supra,* 340 A.2d at 812. "Our review is deferential because the question of prejudice turns substantially on the juror's demeanor ..., and is therefore one about which the trial judge is especially qualified to render a sound opinion." *Leeper v. United States,* 579 A.2d 695, 698 (D.C.1990) (citations and internal quotation marks omitted); *see also Darab v. United States,* 623 A.2d 127, 138 n. 26 (D.C.1993); *Harris v. United States,* 606 A.2d 763, 765 (D.C.1992). "This court, on the other hand, is limited to a paper record which may capture the words of a case but not its heart and soul." *In re S.G.,* 581 A.2d 771, 774 (D.C. 1990). The words of Judge Jerome Frank, writing for a particularly distinguished court,[2] are especially a propos in this context:

[T]he demeanor of an orally-testifying witness is always assumed to be in evidence. It is wordless language. The liar's story may seem uncontradicted to one who merely reads it, yet it may be contradicted in the trial court by his manner, his intonations, his grimaces, his gestures, and the like—all matters which cold print does not preserve and which constitute lost evidence so far as an upper court is concerned. For such a court, it has been said, even if it were called a rehearing court, is not a reseeing court. Only were we to have talking movies of trials could it be otherwise. A stenographic transcript correct in every detail fails to reproduce tones of voice and hesitations of speech that often make a sentence mean the reverse of what the words signify. The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried. It resembles a pressed flower. The witness' demeanor, not apparent in the record, may alone have impeached him.

*Broadcast Music, Inc, v. Havana Madrid Restaurant,* 175 F.2d 77, 80 (2d Cir.1949) (footnotes and internal quotation marks omitted); *see also Stewart v. District of Columbia Dep't of Employment Serv.,* 606 A.2d 1350, 1353 n.5 (D.C.1992) (quoting *Broadcast Music, Inc.*).

Just as a cold transcript may make a liar come across as a paragon of veracity, so the "dehydrated peach" which represents our sole knowledge of Juror No. 1 may distort much that was quite evident to a trial judge who was on the scene and could appraise the situation first hand.

I agree with the majority—any reasonable person would—that Juror No. 1's comments necessarily gave rise to a suspicion that he might not be impartial. At the same time, there is much in the record (including, *e.g.,* the defense attorney's decision to "pass" on his peremptory challenges instead of "striking" Juror No. 1, and counsel's apparent satisfaction with the juror even after the latter's announcement that his heart was "skipping a little bit here") to suggest that all concerned viewed Juror No. 1 as a conscientious and candid individual who could be relied upon to render a fair verdict based upon the evidence and the judge's instructions as to the law.

2. The other members of the court were Judge Learned Hand and Judge Augustus Hand.

The trial judge—in this case, one of the Superior Court's most experienced jurists—was obviously aware of the problem. His assessment of Juror No. 1 was based on his personal observation of the juror. We ought to be most reluctant to second-guess the judge who was on the scene when our view is constricted by our lofty appellate perch. I would affirm the judgment.