**Phillip H. JOHNSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 94–CF–1580.**

District of Columbia Court of Appeals.

Argued April 16, 1997.
Decided Oct. 9, 1997.

---

Mark J. Rochon and William P. Barry, Washington, DC, for appellant.

Robert Swanson, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher and Thomas C. Black, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, RUIZ, and REID, Associate Judges.

RUIZ, Associate Judge:

Phillip Johnson raises four issues on appeal: (1) whether the trial court abused its discretion when it denied Johnson's motion to strike Juror # 464 for cause, and, later, denied Johnson's motion for a mistrial when the juror became a deliberating juror under circumstances in which Juror # 464 had indicated that she had a close relationship with a friend who, in turn, was close to relatives of the victim present in the courtroom, and the juror demonstrated an inability to objectively evaluate the evidence;[1] (2) whether the trial court erroneously instructed the jury that Johnson could be convicted of first-degree murder while armed if the jury found that he "participated" in "premeditated murder"; (3) whether the trial court abused its discretion when it allowed the government to introduce a picture showing Johnson holding a revolver similar to the one used in the offense; and (4) whether the trial court erred when it allowed the government to introduce evidence of another shooting, also involving Johnson, that led up to the murder of which he was convicted. We reverse and remand

on the issue of the trial court's failure to strike Juror # 464 for cause or to declare a mistrial once it became necessary for Juror # 464 to become a deliberating juror. These errors infringed upon Johnson's Sixth Amendment "right to ... trial, by an impartial jury ..." and his Fifth Amendment right to Due Process, which requires a fair trial. U.S. CONST. amend. VI, V. In view of our disposition, we also address, but find no merit in, Johnson's third and fourth claims, which are likely to arise in a new trial.

I.

On June 17, 1991, Jasper Williams was murdered when four youths held him down and shot him eight times in the head and face. Three days earlier, on June 14, 1991, a fight had broken out at a neighborhood dance between Williams and Johnson's brother, Tyrone Johnson, who apparently lost the fight to Williams. The evidence presented at trial indicates that although Johnson was not present at the time of the fight, he was there immediately following the fight. The next day, June 15, 1991, Robert Lane, a friend of Williams, had an argument with Johnson and his brother about the fight the previous night; Lane was shot by Tyrone Johnson after Johnson said "bust him [i.e., Robert Lane]." Shortly after the shooting of Lane, Williams had an argument with Johnson's girlfriend, Charlene Hamilton, and hit her. Two days later, Williams was shot dead. Johnson was charged with his murder and related firearms offenses.

The first trial ended in a mistrial when the jury was unable to reach a verdict. At a retrial, the subject of this appeal, Johnson was convicted of first-degree murder while armed, D.C.Code §§ 22–2401, –3202 (1996 & 1997 Supp.), and sentenced to twenty years to life imprisonment; he was acquitted of charges for possession of a firearm during a crime of violence, D.C.Code § 22–3204(b) (1996 & 1997 Supp.), and of carrying a pistol

[1]. Johnson also claims in his brief that irregularities involving another juror, Juror # 497, deprived him of a fair trial. Juror # 497 had informed the court that he recognized William Arrington, the government's eyewitness, having previously worked with his wife. Johnson's trial counsel made no effort to exclude Juror # 497; the record indicates that the juror's limited association with the witness did not affect his ability to be objective and impartial. We see no merit in Johnson's claim regarding Juror # 497.

without a license, D.C.Code § 22–3204(a) (1996 & 1997 Supp.).

William Arrington testified at trial that at approximately 10:30 p.m. on the night of the murder he was walking alone on 13th Street when he saw four people crouched down over Williams and heard gun fire. Arrington testified that as Johnson turned, he could see Johnson's face; he also saw "flashing" coming from Johnson's right hand, but he did not actually see Johnson with a gun. Arrington testified that he again saw Johnson's face when Johnson turned toward him as Johnson stood up to run. After the shooting, two of the youths ran around the corner and the other two, including Johnson, ran down 13th Street. Arrington testified that all the streetlights were on and that there were streetlights on each corner. Arrington later picked Johnson's picture out of a photo lineup as one of the people from whom sparks emanated during the shooting of Williams. When asked in court how sure he was that Johnson was the man he saw leaning over Williams with the sparks flying, Arrington testified that he was "a hundred percent sure."

Autopsy reports showed that Williams died of eight gunshot wounds to the head and face. Gary Phillips, the government's firearms expert, testified that at least two different firearms were used in the shooting of Williams. Phillips identified the gun held by Johnson in a photograph entered as evidence as a .38 or .32 caliber revolver consistent with the gun used to fire four .38 caliber rounds recovered from Williams' head.

## II.

We first address the claim of juror bias related to Juror # 464. On the first day of trial, one of the fourteen jurors was absent. The trial court removed the absent juror from the jury and decided to proceed with thirteen jurors, leaving only one alternate. Approximately three-quarters of the way through the trial, Juror # 464 brought to the trial court's attention that she had a close friend, "Louise," who knew two women sitting in the public gallery and that she had seen the women at Louise's home. The trial judge questioned Juror # 464 to determine her partiality:

> The Court: Now, would the fact that you've seen these ladies, and we don't know why they are here, with this other person [Louise] affect your ability to be fair and impartial to the Government or the defense in this case?
>
> Juror No. 464: I think so because I kind of know—they are very, very close.

Juror # 464 apparently was confused by the trial judge's follow-up questions because at first the juror mistakenly indicated that she thought she would be partial to the defense because of her relationship to Louise, who was close friends with the two women.

Juror # 464's sympathies were soon clarified. After the trial judge's initial questioning of Juror # 464, the deputy clerk informed the court that Juror # 464 had informed the clerk that she believed the women in the courtroom who had been of concern to her were related to the decedent; Juror # 464 repeated that she was close friends with Louise who was very close friends with the decedent's relatives. The government indicated for the record that the two women in the audience were in fact Williams' mother and aunt. The trial judge then brought Juror # 464 to the bench for further questioning which indicated that the juror's sympathies were for the victim's family and not for the defendant. In response to the trial judge's question if she knew how these two women were related to the case, Juror # 464 responded, "I guess by her crying, when the examiner was here yesterday, I guess she is probably related to the deceased ... I'm not sure. I don't know."

The trial judge asked Juror # 464 a number of times if she could be impartial in light of her friend's relationship to the relatives of the murder victim. Juror # 464 wavered back and forth; first she said she did not know whether she would be likely to favor one side or the other; then she stated, "It's kind of hard when you know somebody who know somebody. It's really kind of hard to make that decision." When defense counsel asked Juror # 464 whether she was sympathetic to the two women in the gallery who she thought were connected to the case, the

juror responded, "I think so." Defense counsel then asked whether her sympathies might cause her to lean one way or the other in making her decision, independent of the facts. Juror # 464 responded, "I don't know. It makes me kind of nervous because I have seen this other person with a friend of mine. So, it does kind of make me kind of nervous." [2]

Separately, the trial judge had engaged in a colloquy with the deputy clerk about whether Juror # 464 was the same juror who was "squeamish about the pictures" of the decedent at the murder scene. When the deputy clerk responded in the affirmative, the court stated, "[t]his lady has not looked at any of the evidence." The trial judge added, "[s]he's been very carefully studying her purse through this trial."

Juror # 464 stated under questioning by the trial judge that she did not like the look of the pictures of the young dead man laying on the ground, that when the medical examiner was doing his diagram, she never looked at it, and that her participation in the case made her uncomfortable. When the trial judge again inquired whether she could "fairly judge the evidence," Juror # 464 responded, "I think I can." Interpreting Juror # 464's nervousness as simple discomfort with the trial, the court reasoned that the juror was "uncomfortable" being on the jury and explained to the juror that comfort or the lack thereof did not equal bias and prejudice.[3]

Johnson's trial counsel requested that Juror # 464 be removed from the jury and the government suggested moving her to the alternate slot. The court initially denied both motions based on the juror's indication that she could be fair and impartial. At a later point, however, it appears that Juror # 464 was designated the alternate juror. On the morning of closing arguments, one of the jurors on the panel was sick and it became necessary for Juror # 464, who was the only alternate, to become a deliberating juror. When Juror # 464 was informed that she would be a deliberating juror, she exclaimed, "I just knew it was me." Defense counsel moved for a mistrial, which was denied.[4]

A trial judge has broad discretion in deciding whether to exclude a juror for cause. *See Wilburn v. United States*, 340 A.2d 810, 812 (D.C.1975). Where a claim of juror bias is made, the proper procedure is "a hearing in which the defendant has the opportunity to prove actual bias." *Harris v. United States*, 606 A.2d 763, 765 (D.C.1992) (quoting *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78, (1982)) (internal citations omitted). If the claim is made during trial, *voir dire* is reopened; if after trial, a post-trial hearing is held. After such a hearing, the trial court must strike a juror it determines cannot "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Allison v. United States*, 451 A.2d 877, 879 (D.C.1982) (internal citation omitted). If the juror is struck during trial, the remedy is to "unseat the prejudiced juror in favor of an alternate." *Artisst v. United States*, 554 A.2d 327, 331 (D.C.1989). If after trial, "the proper remedy is a new trial." *Id.* at 330. This court will not reverse the trial judge's decision not to strike a juror unless the juror's partiality is manifest. *See Hughes v. United States*, 689 A.2d 1206, 1210 (D.C.1997) (citations omitted). Where the trial court fails to strike a juror for cause, and the juror's partiality is manifest to the appellate court, a

---

**2.** After the questioning regarding her partiality for the victim's family, Juror # 464 also indicated to the court that she knew one of the defense witnesses, Jerita Johnson. Juror # 464 informed the court, however, that this association would not affect her impartiality.

**3.** At another point in the trial, Juror # 464 had claimed she hurt herself and could no longer continue on the jury panel.

**4.** We note that neither the trial judge nor the parties considered the option of excusing Juror # 464 and proceeding, with the agreement of all parties, to a jury of eleven. D.C.Code § 16–705(c) (1997) provides in pertinent part:

The jury shall consist of twelve persons, unless the parties, with the approval of the court … agree to a number less than twelve. Even absent such agreement, if, due to extraordinary circumstances, the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict … a valid verdict may be returned by the remaining eleven jurors.

structural error in the conduct of the trial requires reversal. *Id.*

In *Hughes*, we held that a juror manifested prejudice when, finding his "heart skipping a little bit here," he told the trial court that a former Assistant U.S. Attorney who had worked on the defendant's case was "a close friend" of his, and that he "absolutely refuse[d] to accept" that "the prosecutors may have inserted words into the witness' mouth." 689 A.2d at 1210. We stated that, "[t]hese words were not indicative of an open mind" and that the trial court should have replaced the juror with an alternate juror. *Id.* In concluding that the participation of the juror denied Hughes "the right to . . . trial, by an impartial jury," guaranteed by the Sixth Amendment to the Constitution, we pointed out that, in addition to the juror's relationship with a former U.S. Attorney and his favorable view of law enforcement, the record did not reflect any explicit or unequivocal statement from the juror that he could be a "fair, fearless and disinterested" juror. *Id.* at 1211. We stated in *Hughes* that "[a] suspicion of prejudice should have prompted the trial court, at a minimum, to re-open the *voir dire* to determine whether actual bias existed." *Id.* at 1210 (citing *Artisst, supra*, 554 A.2d at 331). The trial court had not conducted a hearing on the issue. *Id.* at 1210.

Unlike in *Hughes*, here the trial court, in response to defense counsel's motion to excuse the juror for cause, questioned the juror. The question before us, therefore, is whether the trial court abused its discretion in determining that Juror # 464 need not be stricken for cause. As in *Hughes*, Juror # 464's statements in this case were not indicative of an open mind, and the record does not reflect any explicit or unequivocal statement that she could be a fair and disinterested juror. To the contrary, Juror # 464 stated that it would be difficult for her to be impartial because the two women she recognized in the courtroom and her friend Louise "are very, very close," and that "[i]t's kind of hard when you know somebody who know somebody." Juror # 464 stated that she assumed that Louise's friends, present in the courtroom, were members of the victim's

family because of their emotional reaction to the medical examiner's testimony. In response to defense counsel's question whether her sympathies might cause her to lean one way or another, independent of the evidence, Juror # 464 said, "I don't know."

Taken as a whole, Juror # 464's responses to the trial judge's and defense counsel's questions demonstrate that she was uncertain she could be impartial, that she felt she was sympathetic to the murder victim's family and that she did not know whether her sympathies would cause her to lean one way or the other, independent of the evidence presented at trial. Her statements were confirmed by her actions and noted by the trial court: she did not look at the evidence and she said she felt uncomfortable participating as a member of the jury. On the last day of trial, when it became evident that the illness of another juror would require her to deliberate, Juror # 464's outburst, "I just knew it was me," highlighted her emotional discomfort. The close friendship between Juror # 464 and Louise, who was in turn a close friend of the murder victim's mother and aunt, who were present in the courtroom and visibly emotional during part of the trial, provided at least as much, if not more, of a suspicion of prejudice than was present in *Hughes*, where the juror's relationship was with a former assistant U.S. attorney who was not present in the courtroom and whose previous participation in the case was not an issue at trial.

 The trial judge has a responsibility to evaluate a claim of prejudice to ensure that jurors remain impartial and base their findings solely on the evidence. "Due Process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Shannon & Luchs Mngmt. Co. v. Roberts*, 447 A.2d 37, 41 (D.C.1982) (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982)). We are mindful that the trial court's judgment on the issue of bias is entitled to great deference because it turns on an appraisal of the juror's demeanor. *See Leeper v. United States*, 579

A.2d 695, 698 (D.C.1990). The trial court decided not to strike Juror # 464 when, in response to the judge's inquiry whether she could fairly judge the evidence, Juror # 464 ventured that "I think I can." That statement—hardly a ringing declaration of impartiality—was too slim a reed upon which to base a determination that the juror was not partial. "The principle that a juror is well qualified to say whether he has an unbiased mind in a certain matter, loses much of its pertinency when that same juror has declared himself of two minds ..." *Hill v. United States*, 622 A.2d 680, 685 (D.C.1993) (internal citations omitted). Here, in addition to the juror's inconsistent statements in response to the judge's questioning, the record amply supports that Juror # 464's spontaneous statements and actions demonstrated that she was not impartial and that she was, in fact, biased against the defendant as a result of her friendship with a close friend of the victim's family.

 In evaluating trial court discretion in responding to claims of juror bias, we place significance on when the potential bias is discovered. *See Artisst, supra*, 554 A.2d at 330 ("Different procedures and remedies are required for handling an incompetency discovered after trial than for that discovered during trial."). A trial court considering a claim of juror bias that arises after trial may view the claimed bias in the context of certain factors, including the investment of judicial and other resources and the great reluctance to impeach a jury verdict unless it is shown to have actually been affected by an improper influence. *See Sellars v. United States*, 401 A.2d 974 (D.C.1979) (refusing to impeach a verdict after it was rendered by the jury, despite discovery after trial that some jurors were confused by the court's instructions, where the weight of the evidence clearly supported the verdict). Where

the claim of bias is made during trial, however, the trial court should apply a somewhat lower threshold in determining whether to excuse a juror to ensure that the jury remains impartial and bases its verdict solely on the evidence. *See Hughes, supra*, 689 A.2d at 1210 (holding that during trial, where there was a "suspicion of prejudice" by one juror, the trial court should have replaced that juror, or "at a minimum ... reopen[ed] the *voir dire* to determine whether actual bias existed").[5]

Juror # 464's prejudice was discovered in this case during trial, before the jury began deliberations. The problem appears to have been recognized by all: Johnson's trial counsel acted promptly upon learning of Juror # 464's concerns, participating in questioning the juror about her possible partiality and moving, first, to strike the juror for cause and replace her with an alternate, and later, for a mistrial once she became a deliberating juror; the government suggested that Juror # 464 be moved to the alternate slot, apparently expecting (or hoping) that she would not be called to deliberate; the trial judge and court clerk also recognized that Juror # 464 was purposely avoiding the evidence. Although the record does not reveal that it was part of the trial court's consideration, we note that at the first motion to strike the juror and replace her with an alternate, it would have been possible to do so because there were then thirteen jurors on the panel. On the other hand, at the second motion, for a new trial, the participation of Juror # 464 was required for there to be a deliberating jury of twelve.[6]

 Under these circumstances, we conclude that Johnson established that Juror # 464's statements and conduct sufficiently manifested danger of actual bias so that the trial court abused its discretion when it failed to strike Juror # 464 for cause and either

---

**5.** The cause of the prejudice is also significant in evaluating the defendant's claim of juror bias. For example, in cases where the alleged bias results from the juror's contact with extraneous information, once the defendant shows there is a "substantial likelihood of actual prejudice," the burden shifts to the government to prove harmlessness, and "all reasonable doubts [about the juror's ability to render an impartial verdict must be] resolved in favor of the accused." *Hill, su-*

*pra*, 622 A.2d at 684 (quoting *United States v. Williams*, 262 U.S.App. D.C. 112, 128, 822 F.2d 1174, 1190 (1987)).

**6.** We note also, however, that the trial court launched a first-degree murder trial which lasted ten days with only thirteen jurors, after Johnson's first trial ended in a hung jury.

replace her with an alternate or declare a mistrial. Only "by a punctilious regard for a suspicion of prejudice can we hope to maintain the high tradition of our jury system. We must make sure that the lamentations of the unsuccessful litigant [are] without foundation, either in fact or circumstance." *Hughes, supra,* 689 A.2d at 1210 (citing *Allison, supra,* 451 A.2d at 879) (internal citations omitted).

■ As in *Hughes,* we conclude that the failure to strike Juror #464 constituted structural error requiring reversal because "the presence of [the] [j]uror ... in the jury box denied Hughes 'the right to ... trial, by an impartial jury,' guaranteed by the Sixth Amendment to the Constitution." 689 A.2d at 1211. This safeguard is especially important in a case of this magnitude, where a substantial portion of a person's life is at stake. Under the circumstances of this case, the risk of a tainted verdict from the juror's sympathy for the victim's family and her stated concerns regarding her ability to be impartial is too great to permit the judgment to stand. *See Hill, supra,* 622 A.2d at 681. Therefore, we reverse Johnson's conviction and remand with instructions to grant him a new trial. "[S]tructural defects in the constitution of the trial mechanism ... defy analysis by 'harmless-error' standards." *Hughes, supra,* 689 A.2d at 1210 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309, 111 S.Ct. 1246, 1264, 113 L.Ed.2d 302 (1991)). "Harmless-error analysis ... presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." *Id.* (quoting *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986)).

### III.

■ In light of our reversal on the issue of juror bias, we address only Johnson's other claims that are likely to arise at a retrial. Johnson claims that the trial court erred when it allowed the government to introduce a picture taken more than a year before the murder which showed Johnson holding a re-

volver similar to the one used in the murder. The government's firearms expert, Gary Phillips, identified the gun held by Johnson in the photograph as a .38 or .32 caliber revolver consistent with the gun used to fire four .38 caliber rounds recovered from Williams' head. The gun in the photograph was of a design which most firearms manufacturers abandoned in the late 1940's, and which, with regular use, would have worn the rifling on the inside barrel of the gun. Such a gun could have fired the four .38 caliber bullets recovered from Williams' head that Phillips examined and found to have with no rifling marks on them. This Court has "held on several occasions that evidence of possession of a weapon on an earlier occasion by one later charged with using a similar weapon is probative, relevant evidence." *Marshall v. United States,* 623 A.2d 551, 554 (D.C.1992) (citing *Jones v. United States,* 477 A.2d 231, 239 (D.C.1984)). Although there was a long lapse between the time the photograph was taken and the murder, the photograph was admissible because the requisite link was made between the gun Johnson held in the photograph and the gun used in the crime. *See King v. United States,* 618 A.2d 727, 728 (D.C.1993).

■ Johnson also claims that the trial court abused its discretion when it allowed the government to introduce evidence related to the shooting of Robert Lane.[7] In *Johnson v. United States,* 683 A.2d 1087, 1100 (D.C. 1996) (en banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997) (citing *Huddleston v. United States,* 485 U.S. 681, 687, 691, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988)), we established that probative value must be "substantially outweighed" by the danger of unfair prejudice involving other crimes to render otherwise relevant evidence inadmissible. Here, the Lane shooting was clearly related to, and helped to explain, Johnson's shooting of Williams. We conclude that the trial court did not abuse its discretion in admitting evidence of the Lane shooting. *See id.* (stating that evaluation and weighing of evidence for relevance and po-

---

7. Johnson does not contest that the evidence showed by clear and convincing evidence Johnson's involvement in the Lane shooting and that it was admitted to prove that Johnson had a motive to kill Williams. *See Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964).

tential prejudice is a discretionary function of trial court, and we owe a great degree of deference to its decision).

■ Finally, Johnson argues that the trial court improperly permitted the government to cross-examine his girlfriend and alibi witness, Charlene Hamilton, in a manner that introduced evidence of yet a third crime of which he previously was charged. The evidence was admissible, on cross-examination, to establish bias on the part of Hamilton who had on two previous occasions provided alibis to Johnson. *See Samuels v. United States,* 605 A.2d 596, 597 (D.C.1992) (stating scope of cross-examination on issue of a witness' bias is a matter within the sound discretion of trial court, and holding that trial court did not abuse its discretion by allowing the government to elicit testimony admitted for limited purpose of demonstrating bias during cross-examination, even though it revealed defendant's prior "bad acts"). We note that the trial court limited the scope of the cross-examination of Hamilton and disallowed discussion of the substance of the other cases, mitigating the risk that prejudice from this evidence would substantially outweigh its probative value.

*Reversed and Remanded.*