Antoine McCONNAUGHEY, Appellant,

v.

UNITED STATES, Appellee.

No. 96–CF–365.

District of Columbia Court of Appeals.

Argued Feb. 6, 2001.

Decided Aug. 8, 2002.

Thomas D. Engle, appointed by the court, with whom Sharon L. Burka and Quinn O'Connell, Washington, DC, were on the brief, for appellant.

Catherine Cortez Masto, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Mary–Patrice Brown, and Halsey B. Frank, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and GLICKMAN, Associate Judges.

TERRY, Associate Judge:

Appellant was convicted of second-degree murder while armed, assault with intent to kill while armed, two counts of possession of a firearm during a crime of violence (PFCV), and carrying a pistol without a license (CPWL). On appeal he contends that the trial court erred by admitting testimony about his prior possession of a gun, by allowing a government witness to be impeached with an audio tape of his grand jury testimony, by responding to a jury note without notifying defense counsel, and by excluding children from the courtroom during the trial.[1] We find no error and affirm the convictions.

1. Appellant also asserted in his brief that his two convictions of PFCV should merge. At oral argument, however, he conceded that the convictions should not merge in light of *Stevenson v. United States*, 760 A.2d 1034 (D.C.

## I

### A. *The Shootings*

On November 7, 1994, appellant shot and killed his stepfather, Ronald Jones, and, minutes later, shot and wounded another man, Melvin Seals. Appellant denied shooting Seals and claimed that he acted in self-defense when he shot and killed Jones.

Appellant's grandmother, Martha McConnaughey Higgs, testified that on the evening of November 7 Jones was sitting alone in her kitchen while she was in an adjacent room.[2] She saw appellant enter the kitchen empty-handed, and soon thereafter she heard gunshots from the kitchen. She entered the kitchen and found Jones lying on the floor, bleeding and unconscious. Sometime after the shooting, Mrs. Higgs saw appellant "wandering around the hall with the gun," so she took the gun from him and "put it in the basement" so that "the police didn't see it."

Appellant claimed that when he entered the kitchen, he found Jones pointing a gun at him; a struggle ensued, and he shot Jones in self-defense during the struggle. He presented evidence that Jones' stay at the Higgs home had been turbulent and that Jones had a history of mental illness and violent criminal behavior. Appellant also testified that, on the night before the shooting, he and his grandmother had argued with Jones, and in response Jones had threatened to "kill everybody" in the house.

Melvin Seals was visiting the Higgs household that evening. After a disagreement with appellant concerning a $12 debt, Seals left the house and sat on a neighbor's porch. As he was sitting there, his friend Marty McGill came out of Mrs. Higgs' house and said to Seals, "Man, Link [appellant] just did that to his stepfather." Seals then heard appellant say, "Where [is] Melvin at?" When McGill replied, "Melvin ain't out here," appellant told him to "stop lying." A moment later, appellant reached his arm out through the open doorway of the Higgs house and fired three shots toward Seals. Seals ducked, then jumped up and ran around the corner, but as he ran, he was shot in the right shoulder. He kept running until he reached a nearby firehouse, where he told a paramedic that he had been shot.

When the police arrived, appellant ran out the back door of the house. Police officers gave chase and eventually detained him after he tried to hide in a neighbor's back yard. At the police station, appellant told the investigating detectives that he would show them where he hid the gun that he had used to kill Jones. He took them to the garage of Mrs. Higgs' house, but no gun was found. He later returned to the house with the police and asked Mrs. Higgs to give the police the gun, but she did not produce it. The officers informed Mrs. Higgs that they were securing the area while they obtained a search warrant. A few minutes later, Lola McConnaughey, appellant's aunt, attempted to leave the house with a backpack, stating that she was going to work. The

2000), and later formally withdrew that argument by letter.

**2.** Both appellant and Jones were living in Mrs. Higgs' house at the time of the shooting, along with several other family members. Jones had been married to Lisa McConnaughey, appellant's aunt, who died in 1986. After her death, Mrs. Higgs took her grandson, the son of Lisa McConnaughey and Ronald Jones, into her home and raised him. Mr. Jones moved into the Higgs home several years later so that he could "be a father" to his son. At some point Jones married appellant's mother, but the record does not reveal when that happened.

police told her she could not leave with the backpack, but Ms. McConnaughey managed to slip out the back door with it, and her mother, Mrs. Higgs, locked the door behind her and blocked the officers' access to the door.

The gun used in the shootings was never recovered. In an upstairs bedroom, however, the police found a red bag containing a holster and a box of Winchester .32 caliber semi-automatic ammunition. There was evidence that appellant slept in that room regularly, but the room was open to and used by other family members. Appellant testified that the red bag did not belong to him and that he had never seen it before.

Lola McConnaughey testified that she saw two guns under a mattress in the basement on the day after the shooting. One of the guns was a silver handgun.

Four .32 caliber metal-jacketed bullets were recovered from the house: one from the front porch, one from the dining room, and two from the kitchen. Four .32 caliber automatic shell casings were also recovered, one from the front porch and three from the kitchen floor. A firearms expert testified that the bullets found at the scene were of a type generally used in semi-automatic pistols and that they were all fired from the same gun. The shell casings were manufactured by Winchester, and both the shell casings and the bullets were likely fired from a semi-automatic .32 caliber pistol.

The medical examiner concluded that Jones died from two or three gunshot wounds to the head and that there appeared to be "no physical findings of injury that would [indicate] a struggle may have occurred."

## B. *The Evidence of Prior Possession of a Gun*

Before the grand jury, Melvin Seals testified that on at least two occasions prior to the night of the shooting, he had seen appellant in possession of a chrome-colored .32 caliber automatic pistol with a black or brown handle. He said that appellant liked to show the gun so that others in the neighborhood were aware of its existence. Seals testified that he saw the gun at close range two different times in 1994.[3] When he was shot, Seals did not see the gun, but he stated that he "knew what it was," and that "when [the bullet] went in and out and I seen how little the hole was, and I knew what kind of gun he had, I knew what he hit me with. . . ."

In response to a pre-trial motion *in limine* by the government concerning the admissibility of certain evidence, defense counsel filed a memorandum opposing the introduction of Seals' grand jury testimony about his prior sightings of the gun, claiming that it was "not only speculative, remote in time and ambiguous, but also its probative value [did] not outweigh its severe prejudice . . . to the defendant." After a hearing, the court ruled that the evidence would be allowed. Although a lengthy gap in time between the prior sightings and the shooting would make the prior sightings less probative ("the longer you go makes it less likely that we're talking about the same gun"), the court said, as long as the testimony showed that the gun was the same .32 caliber pistol used in the crime, it would be "clearly relevant" and hence admissible.

---

**3.** Seals testified before the grand jury that he saw the gun in 1994 and that he was shot in 1995. He was actually shot, however, in November 1994, a fact which may cast doubt on the accuracy of his statement that he saw the gun twice in 1994. Regardless of Mr. Seals' possible confusion about when he saw the gun, appellant concedes that it could have been within one year of the shooting.

When Seals was called to testify at trial, he denied knowing who shot him and stated that he was "persuaded" and "tricked" into testifying before the grand jury. The court then allowed the government to play an audio tape of Seals' grand jury testimony after giving both parties a chance to redact any objectionable material. Defense counsel moved once again to exclude Seals' grand jury testimony about the prior sightings of the gun. After listening to the tape, and noting that the prior sightings occurred in 1994 or 1995, the court denied the motion, stating:

> Again, this tends to show that he examined [the gun]. If it's the same gun—if he can say, "I saw it . . . I examined it," the time frame becomes less relevant. The closeness in time becomes very important if we're trying to rely on some inference that it was the same gun.

## II

■ Appellant argues that the trial court abused its discretion in admitting Melvin Seals' grand jury testimony that he saw appellant in possession of a chrome-colored automatic pistol on two prior occasions. He maintains that the "tenuous" temporal connection between the crime and the prior sightings of the weapon was not sufficient to establish a "link" between the murder and appellant's possession of the gun, as required by King v. United States, 618 A.2d 727 (D.C.1993). We hold that, because the evidence of prior possession of the gun was sufficiently linked to both appellant and the crime charged, the trial court acted within its discretion in admitting the grand jury testimony. See

King, 618 A.2d at 729; accord, e.g., (Phillip) Johnson v. United States, 701 A.2d 1085, 1092 (D.C.1997).

First, the gun was sufficiently linked to appellant. King, 618 A.2d at 729. Seals testified that he twice saw appellant with a chrome-colored .32 caliber automatic in his possession. This testimony sufficiently connected appellant to the gun that may have been the murder weapon. See, e.g., Busey v. United States, 747 A.2d 1153, 1165 (D.C.2000); Johnson, 701 A.2d at 1092; Coleman v. United States, 379 A.2d 710, 712 (D.C.1977).

Second, the gun was sufficiently linked to the crimes charged. King, 618 A.2d at 729. Although no murder weapon was recovered, testimony established that the bullets used to kill Jones came from a .32 caliber semi-automatic pistol. Other evidence established that bullets and shell casings of the same caliber were recovered from the areas where both Jones and Seals were shot, and a holster and a box of .32 caliber ammunition of the same make were discovered in a bedroom used mainly by appellant. In addition, Lola McConnaughey testified that on the day after the shootings she saw a silver gun hidden in the basement of the house where appellant lived. This evidence sufficiently connected the gun to the two shootings. See, e.g., Johnson, 701 A.2d at 1092; Ali v. United States, 581 A.2d 368, 374–375 (D.C.1990), cert. denied, 502 U.S. 893, 112 S.Ct. 259, 116 L.Ed.2d 213 (1991).[4]

Even if the prior sighting occurred eleven months or more before the crime, as appellant claims, the testimony was admis-

4. The connection here was not "conjectural," as appellant claims. In Burleson v. United States, 306 A.2d 659 (D.C.1973), on which appellant relies, the central issue was whether a gun was used at all in the commission of the crime. In this case, however, there was no dispute that a gun was used. It was a .32 caliber automatic, according to the firearms expert, and the gun that Seals saw in appellant's possession was also a .32 caliber automatic. That fact was sufficient to connect the gun that Seals saw with the gun used in the two shootings.

sible. In *Johnson* a photograph of the defendant holding a revolver of the same caliber as the gun used in a murder was held admissible, even though the photograph was more than a year old, because the requisite link was made between the gun depicted in the photograph and the gun used in the crime. *Johnson,* 701 A.2d at 1092 (citing *King,* 618 A.2d at 728). The length of time between the sighting of the gun and the shootings in this case, as the trial court correctly noted, "becomes less relevant" in light of the evidence strongly suggesting that the gun that Seals saw was the gun with which Jones and Seals were shot.

▮ Appellant also asserts that the trial court failed to balance the prejudicial effect of the evidence against its probative value. We disagree. When relevant evidence is challenged on the ground of unfair prejudice, it may be excluded only if "the danger of unfair prejudice *substantially* outweigh[s] [its] probative value...." *(William) Johnson v. United States,* 683 A.2d 1087, 1099 (D.C.1996) (en banc) (emphasis in original), *cert. denied,* 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997). We have held that "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." *Coleman,* 379 A.2d at 712. We apply that holding here. It is true that the evidence established only a reasonable probability, and not a certainty, that appellant possessed the murder weapon, but this lack of certainty went only to the weight of the evidence, not its admissibility. *Busey,* 747 A.2d at 1153. The trial court did not abuse its discretion in ruling that Seals' testimony was relevant and admissible.

### III

▮ Appellant contends that the trial court erred by allowing the jury to hear, over objection, an audio tape of Seals' grand jury testimony. We find no error in the admission of the tape.

When Seals was called to testify, he stated that he "really [did not] have a clue" as to who shot him and theorized that his assailant might have been "some other dude from some other street." When the prosecutor asked Seals if he remembered testifying before the grand jury, Seals responded, "I remember being persuaded to go to the grand jury for something I don't know about. I was tricked."

The prosecutor then attempted to impeach Seals with a transcript of his grand jury testimony, but Seals could not read it because of a learning disability. The judge suggested that the parties play the tape for Seals, but Seals refused to listen to the entire tape. The prosecutor then asked permission to play the tape to the jury "in its entirety and make [Seals] available for cross-examination." He asserted that the entire tape was admissible as a "contextual" identification of appellant to rebut Seals' current testimony, and also to establish "from his tone of voice and the nature of the conversation" that Seals was not coerced into testifying before the grand jury. Defense counsel objected, arguing that only those "discrete portions" of the grand jury testimony that Seals was now contradicting should be played. The judge overruled the objection, stating that because Seals claimed he was coerced into testifying, his "demeanor becomes significant, and I'm not sure that comes through with snippets." The judge suggested that the parties redact the tape, after which he would make his rulings.

After the parties completed their editing of the tape, defense counsel again requested that the prosecutor confront Seals with the testimony "question by question." The judge denied the request, stating:

[G]iven the practical limitation, we don't have the technology to do a line-by-line playing of a tape.... But I think that given what I think is the virtual non-existent prejudice to your client, by playing it in this format, if we redact any prejudicial items, and given the need to show context on the government's behalf, again, I deny your request to have the government do this in a way I think would be logistically impossible.

When the direct examination of Seals resumed, the prosecutor asked him if he had ever seen the gun with which he was shot. Seals replied that he initially thought it was a "nine millimeter automatic," but that he did not know. The prosecutor asked if appellant had ever talked to him about getting shot, to which Seals replied, "No." The redacted audio tape of Seals' grand jury testimony was then played for the jury.

Appellant claims that the trial court erred by allowing the government to play the redacted tape recording in lieu of Seals' direct testimony. This claim is without merit because the government followed the proper procedure by confronting Seals with his grand jury testimony, giving him an opportunity to explain or deny his prior inconsistent statements, and by affording appellant the opportunity to cross-examine Seals. *See Mercer v. United States*, 724 A.2d 1176, 1196 (D.C.1999); *see also Sparks v. United States*, 755 A.2d 394, 395 (D.C.2000).

*Mercer* involved a challenge to the admission of a videotaped statement that a witness gave to the police. The witness adopted the contents of the statement, but not the videotape itself, before the grand jury while under oath. We held that, while the videotape was admissible under D.C.Code § 14–102, it "should have been introduced while [the witness] was still on the witness stand with the opportunity to explain the videotape, and for the opposing party to have the ability to cross-examine her after viewing the videotape." 724 A.2d at 1196. In this case, the procedure prescribed in *Mercer* was followed. *See also Sparks*, 755 A.2d at 400. The audio tape was introduced while Seals was on the stand, giving him an opportunity to explain his testimony, and defense counsel had ample opportunity to elicit an explanation from Seals on cross-examination.

■ In addition, the combination of factors present in this case—Seals' claim of "forced" grand jury testimony, his inability to read the transcript, his uncooperative conduct when asked to listen to the tape, the technical difficulty of playing the tape line by line, and the fact that the tape had been redacted prior to its playing—supports the trial court's decision to play the tape in its entirety. Grand jury testimony is admissible as substantive evidence under D.C.Code § 14–102,[5] *see Mercer*, 724 A.2d at 1195, and the trial court has broad discretion to determine the propriety of impeachment under section 14–102. *Sparks*, 755 A.2d at 399. In the circumstances presented on this record, we conclude that the trial judge did not abuse

---

**5.** D.C.Code §§ 14–102(b) (2001) sets forth the conditions under which a witness' prior statement can be admitted as substantive evidence:

A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is (1) inconsistent with the declarant's testimony, and given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or ... (3) an identification of a person made after perceiving the person. Such prior statements are substantive evidence.

that broad discretion in allowing the re-dacted tape to be played to the jury.[6]

## IV

■ While deliberating, the jury sent a note to the judge requesting a tape record-er "so that we can play Seales' [*sic*] tape again." Defense counsel apparently was never informed of this note. Appellant now claims that his counsel needed to know of the note so that he could object to the sending of the tape recorder to the jury.

Although "[a] defendant and his counsel have a right to be informed of all commu-nications from the jury and to offer their reactions before the trial judge undertakes to respond," *Smith v. United States*, 389 A.2d 1356, 1361 (D.C.), *cert. denied*, 439 U.S. 1048, 99 S.Ct. 726, 58 L.Ed.2d 707 (1978) (citations omitted), it does not ap-pear from the record that either the trial judge or the courtroom clerk responded to the note from the jury in any way, other than by sending a tape recorder to the jury room. Thus we conclude that no communication occurred at all, let alone an improper communication.[7] Moreover, be-fore the jury retired to deliberate, the judge told the jurors that they would be receiving "all of the exhibits that have been admitted into evidence." If defense counsel had any objection to the transmit-tal of the tape (or of a tape recorder on which to play it), that was the time to object, but no objection was forthcoming.

The tape itself, as we have held, was prop-erly admitted into evidence. The jurors were thus entitled to listen to it again if they chose, and neither appellant nor his counsel had a right to be present when the tape—or the tape recorder—was transmit-ted to the jury. *Quarles, supra* note 7, 349 A.2d at 692.

## V

■ As the pre-trial motions hearing began, the trial judge said:

> The children are welcome to be here until we get a jury in the room, at which point the children will not be allowed in the courtroom.

Appellant now argues that the exclusion of children from the proceedings violated his Sixth Amendment right to a public trial.[8] We hold that appellant's right to a public trial was not violated because the trial was still public enough to satisfy the Sixth Amendment.

In *Sobin v. United States*, 606 A.2d 1029 (D.C.1992), the defendant's children were excluded from the courtroom at sentenc-ing. We held that the exclusion of the children was not a Sixth Amendment viola-tion. In so holding, we noted that the right to a public trial is not an "absolute" right and that the exclusion of the defen-dant's young children "in no way under-mined the public policy goals ... which are advanced by the requirement that criminal proceedings be open." *Id.* at

---

6. Appellant also argues that the redacted tape was inadmissible because it contained prior consistent statements by appellant. *See Daye v. United States*, 733 A.2d 321 (D.C.1999). After the redactions, however, there was noth-ing of substance in Seals' grand jury testimo-ny that was consistent with his trial testimo-ny, and thus there was no reversible error. *See id.* at 327.

7. The transmittal of exhibits to the jury is not a "communication" requiring the presence of the defendant or defense counsel. *See*

*Quarles v. United States*, 349 A.2d 690, 692 (D.C.1975), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976).

8. The government contends that appellant waived his right to a public trial by failing to object when the children were excluded. We need not decide whether he waived his Sixth Amendment right because, on the merits, we conclude that his Sixth Amendment right was not violated.

1033–1034 (citation omitted); *see generally In re Oliver*, 333 U.S. 257, 267–272, 68 S.Ct. 499, 92 L.Ed. 682 (1948).

Appellant attempts to distinguish *Sobin* by claiming that, in this case, all children were excluded,[9] not just two young children as in *Sobin.* However, even if all children were excluded, all other persons were permitted to attend the trial. Here, as in *Sobin,* at no time during the trial did the judge close the courtroom doors to the general public. *See Sobin,* 606 A.2d at 1033. At most, the trial judge effected a partial closing of the proceedings by specifically excluding children from the courtroom.[10] As we held in *Sobin,* the policy goals of the Sixth Amendment were not violated here, and thus reversal is not required.

## VI

The judgment of conviction is

*Affirmed.*

---

9. Although appellant makes the bare assertion that "there were children who wished to view [the] trial," there is nothing in the record to indicate that any children wished to view the trial or that anyone objected to their exclusion. Moreover, it is not clear from the record whether the children were excluded permanently or only for a short time.

10. From the context of the trial court's statements, it appears that the court was excluding some specific children who were present during the pre-trial proceedings, not barring all children from the courtroom. A barring of all children, rather than a select few, might present a closer constitutional question, but we are satisfied that it would not amount to a Sixth Amendment violation in this case. *See Sobin,* 606 A.2d at 1033.