**Dyrell GAMBLE, Appellant**

v.

**UNITED STATES, Appellee.**

**Nos. 01–CF–1091, 03–CO–1569, 01–CF–1106, 03–CO–1490.**

District of Columbia Court of Appeals.

Argued Feb. 3, 2005.

Decided June 15, 2006.

---

Kenneth H. Rosenau, appointed by the court, Washington, for appellant.

John C. Einstman, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and Roy W. McLeese, III, Robert C. Little, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and GLICKMAN, Associate Judges, and TERRY, Senior Judge.*

TERRY, Senior Judge:

Appellant Gamble was convicted of first-degree murder while armed, possession of a firearm during a crime of violence ("PFCV"), and two counts of carrying a pistol without a license ("CPWL").[1] On appeal he makes several assignments of error. He contends that the trial court

---

* Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. The second CPWL charge was brought in a separate indictment, filed some time after the original indictment. It was based on the fact that appellant had a gun in his possession when he was arrested three days after the murder. Shortly before trial, on the government's motion, the two indictments were consolidated, and a count in the first indictment charging possession of cocaine was dismissed.

violated the *Monroe–Farrell* doctrine[2] by failing to take adequate precautions before trial to ensure the effective assistance of counsel. Second, he argues that his pretrial motion to suppress evidence was wrongfully denied. Appellant also makes several claims of plain error based on various evidentiary rulings by the trial court: admitting alleged hearsay statements at the suppression hearing, permitting a witness to testify about appellant's prior possession of a gun, and preventing a defense witness from testifying that a government witness was a police informant (to show that the government witness was biased). Finally, appellant contends that the court erred in denying his motion to vacate sentence under D.C.Code § 23–110 (2001), based on a claim of ineffective assistance of counsel. We reject all of these contentions and affirm both the judgments of conviction and the denial of the § 23–110 motion.

I

A. *The Government's Evidence*

One day in early October 1998, Edward McCoy handed appellant Gamble ten "ziplock dime bags" of crack cocaine to hold for him temporarily because McCoy had plans to "see a female" and did not wish to be found with drugs in his possession in case of a police stop. McCoy testified that he "thought [he] could trust" Gamble, but when McCoy returned about an hour later to retrieve the drugs, Gamble was gone.

Several days later, Davinia Simmons, a friend of both Mr. Gamble and Kareem Holland (the eventual murder victim), was standing at the corner of 10th and N Streets, N.W., when Gamble walked over to her and, referring to Holland, said that he was "going to kill that [man]." When she asked why, Gamble's expletive-laced reply mentioned that Holland kept "harassing him ... about [the] drugs" he had received from McCoy.

A couple of days later, Edward McCoy and William Childs heard Holland tell Gamble that he had to pay for the unreturned drugs.[3] Ms. Simmons also saw Holland "pushing [Gamble] up the street." Later, when she asked Mr. Gamble why he was "letting that [man] push you like that," Gamble replied, "Don't worry about it. I got this." He went on to explain that he allowed Holland to push him only because he did not have his gun with him at the time.

In the early morning hours of October 20, at about 3:00 a.m., McCoy and Holland were walking along N Street near 11th Street when a car pulled up, and Gamble got out. McCoy confronted Gamble and told him to "stop dodging and ducking" and to repay him for the bags of cocaine. Gamble replied that he did not know McCoy was going to be "out here." McCoy and Holland then walked away, but Gamble followed behind them. As they approached an intersection, McCoy heard a shot. Quickly he turned around and saw Gamble, holding a silver pistol with a black handle in his right hand, standing over Holland, who was lying on the ground.[4] McCoy watched as Gamble walked away, concealing the pistol behind a bottle of beer that he was holding in his left hand.

2. *See Monroe v. United States,* 389 A.2d 811 (D.C.1978); *Farrell v. United States,* 391 A.2d 755 (D.C.1978).

3. The testimony does not reveal where this conversation took place, but it appears that there were several other persons present.

4. McCoy also stated that he had seen Gamble with this same pistol a few weeks earlier.

A deputy medical examiner later testified that Holland died within "a couple of minutes" after being shot, and that the cause of his death was a gunshot wound to the head.

The next day, October 21, McCoy went to see Ms. Simmons and told her that Holland had been shot. On October 22 she encountered Mr. Gamble on the street and asked why he "wasn't at the Greyhound or the Dulles Airport." Gamble responded, "I'm not worried about [those men]," and opened his coat to reveal two pistols, one of which was silver. On October 23 William Childs ran into Mr. Gamble and asked him, "What's up?" Gamble replied, "I got my man." Childs testified that Gamble appeared proud of killing Holland.

That same day, Ms. Simmons was walking in the neighborhood when she saw "some guys" who were "talking about killing" Mr. Gamble. Ms. Simmons decided to go to the police and tell them what she knew. She spoke with Detective Bret Smith, who was in charge of the investigation, and explained that her motive in identifying Gamble as Holland's killer was to keep Gamble from being killed.

Several hours later, around 4:00 in the afternoon, Ms. Simmons saw Mr. Gamble walking along 11th Street, N.W. She entered a liquor store where she thought she might find a police officer. Inside the store she recognized off-duty Officer Ricky Hammett and approached him for help. Officer Hammett already knew about Holland's murder, so together he and Ms. Simmons drove around the neighborhood in the officer's car until they caught sight of Gamble. The officer promptly called for

assistance, and additional officers soon arrived in a police car. Hammett and Officer Christopher Myhand then approached Gamble, who by then had entered a barber shop, and told him to place his hands on the wall. When Officer Myhand felt a pistol while patting him down, both officers together handcuffed him. Myhand then reached into Gamble's coat pocket and seized a .380 caliber pistol.

A police firearms expert testified that the recovered gun was test-fired and found to be operable, and that a bullet from the test-firing was a match to the bullet recovered from Holland's head.

## B. *The Defense Evidence*

William Jenkins, who had been previously incarcerated with McCoy, testified that he once overheard McCoy tell another inmate that he was "high" on drugs on the night of the shooting "and he [didn't] really know what happened." Another inmate, James Parker, related a similar conversation with McCoy.[5]

Two other defense witnesses gave testimony that called into question Ms. Simmons' credibility. One of these witnesses, Ronnie Coley, testified that he was near the scene of the crime, and that a few seconds after the shooting he saw a "real tall" man running away from the scene with a shiny object in his hand. Coley said he did not see Mr. Gamble running.

## II

Mr. Gamble was initially represented by appointed counsel from the Public Defender Service, who withdrew from the case on February 26, 1999. Sharon Styles

---

5. Later, in rebuttal, the government presented testimony from Detective Gregory Sullivan, who interviewed Mr. McCoy immediately after the shooting. He stated that McCoy was "very quiet" and "very morose," but that he answered all questions clearly and coherently. Sullivan concluded that McCoy might have been drinking earlier, but "he did not appear intoxicated."

Anderson entered her appearance as retained counsel a week later, on March 5. By letter dated December 22, 1999, investigator Joseph Aronstamn, originally retained by Ms. Anderson, informed Mr. Gamble that as of November 16 he had ceased all investigatory activities because of an overdue balance of approximately $3100. The letter stated that "many valuable defense witnesses who could potentially help in your case may be lost permanently." Mr. Aronstamn also said in the letter that he would not release signed statements or reveal the identities of six potentially exculpatory witnesses.

On February 4, 2000, just three weeks before what was then the scheduled trial date, Ms. Anderson filed a motion to withdraw as counsel. Despite "a number of continuances" that had already occurred, the court granted the motion. Kenneth Page then entered his appearance, and the trial date was continued into the fall. After further continuances, the case finally went to trial in January 2001, and appellant was found guilty as charged. Sentencing was scheduled for March 8 but was later continued until May 18. Shortly before that date, Mr. Page was allowed to withdraw from the case because he had recently moved to New York. Another attorney was appointed to represent appellant at sentencing.[6]

Appellant argues that the trial court failed to take the pre-trial precautions required by the *Monroe* and *Farrell* line of cases to prevent ineffective assistance. An obvious difficulty with this argument is the fact that appellant never made the pre-trial challenge necessary to trigger the court's obligation to conduct a *Monroe–Farrell* inquiry. But even if he had raised the issue in a timely manner, appellant was not prejudiced, because the trial court effectively granted the precise relief required by *Monroe* and *Farrell*—a searching inquiry and an opportunity to obtain new counsel—which appellant unequivocally rejected.

The standard for assessing a post-trial claim of ineffective assistance of counsel has been set forth in myriad cases in this and other courts, most notably *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, when a defendant asserts a claim of ineffective assistance before the trial begins, traditional post-trial concerns are "absent, or certainly less compelling," *Monroe,* 389 A.2d at 819, and "different considerations prevail." *Id.* at 818. Nevertheless, a pre-trial complaint about counsel's performance triggers the court's "constitutional duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." *Id.* at 820; *see Farrell,* 391 A.2d at 761 (finding error in denial of pre-trial motion for new counsel without conducting an inquiry). While the court must refrain from ruling on the claim merely on the basis of the defendant's "naked request," the precise scope of inquiry will depend on particular circumstances and the court's sound discretion. *Monroe,* 389 A.2d at 821.

Appellant asserts in his brief that "[c]learly, [the trial court] recognized the *Monroe–Farrell* issue ... [and] found that a violation of *Monroe–Farrell* was occurring ... [but] failed to provide a sufficient remedy beyond an oral reprimand." We think he reads too much into the court's remarks at the pre-trial hearing and misconstrues the applicability of *Monroe–Farrell.*

On September 18, 2000, a scheduled trial date, an extensive exchange occurred between the court and defense counsel Page

---

6. He is represented on appeal by a new attorney appointed by this court.

after counsel urgently requested a "last-minute continuance." Given the abrupt nature of the previous attorney's withdrawal, the trial court expressed doubts about the performance of that former attorney:

> I must say that this ... is disgraceful. There's no other way around it.... [Ms. Anderson's] conduct in leaving the case without the Court's permission and leaving the case up in the air ... and just doing absolutely nothing and then just coming—see, Judge, I got a new job, I'm out of here, which is basically her attitude ... and quite frankly, I considered then referring her to Bar Counsel, I was so upset with the way, the cavalier way she defended this case.[7]

The court's remarks also reflected great frustration with the case generally:

> [T]he Court has an independent obligation to make sure that these cases go to trial. This case is two years old. There's been a whole litany of continuances, and it's just disgraceful.... [T]his is a first-degree murder case, and as far as I can see, Mr. Gamble's rights are not being protected....

However, contrary to appellant's contention, the trial court never explicitly recognized the applicability of the *Monroe–Farrell* principles to the instant case. The court's oblique reference to the court's "independent obligation to make sure that these cases go to trial," which appellant cites in support of his assertion, cannot reasonably be read as an invocation of the *Monroe–Farrell* standard.

Appellant therefore misconstrues the record when he claims that "once the incompetence was identified, there was an obligation [for the trial court] to correct it by finding adequate counsel for Mr. Gamble." We have repeatedly held that the need for a *Monroe–Farrell* inquiry is limited to cases in which a defendant has raised a specific pre-trial challenge to the effectiveness of counsel. *See, e.g., Mills v. United States,* 796 A.2d 26, 28 (D.C.2002) ("In *Monroe* we held that: 'When a defendant makes a pretrial challenge to the effectiveness of counsel ...' "); *Garrett v. United States,* 642 A.2d 1312, 1314 n. 1 (D.C.1994) ("Under ... the *Monroe/Farrell* rule, when an accused raised pretrial claims of ineffective assistance ..."); *Bass v. United States,* 580 A.2d 669, 670 (D.C. 1990) (quoting *Monroe*). The record before us here reveals that appellant never claimed, before trial, that his attorney was deficient—and thus the court's "special duty" under *Monroe* and *Farrell* to conduct an inquiry was not triggered.

██ But even if appellant had successfully presented a proper *Monroe–Farrell* claim, the court's subsequent discussion at the hearing on September 22, just four days later, would nullify, or at least render harmless, any prior failure to undertake a searching inquiry. *See Monroe,* 389 A.2d at 823. After admonishing appellant's former and then-current defense counsel for their poor case management, the court repeatedly asked appellant whether he would like a new attorney:

> THE COURT: Now, Mr. Gamble, you've heard all this, all right. And if you want Mr. Page now—it seems like things are in place now to get your case finally ready for trial almost two years after you've been locked up here. If you want Mr. Page to stay—and you've heard all this on your case—that's fine. If you want a new lawyer, I suppose you can get a new lawyer. What is your decision, sir?
>
> THE DEFENDANT: I want to keep Mr. Page.

---

7. Apparently, however, the court never referred the matter to Bar Counsel.

THE COURT: You're satisfied with his services?

THE DEFENDANT: Yes, sir.

THE COURT: You understand that I've been very frank with my criticism as to why all the people working for you have let you down in some way. You understand that, sir?

THE DEFENDANT: Yes, sir.

In *McKenzie v. United States*, 659 A.2d 838 (D.C.1995), we held that "[w]hen a defendant makes complaints that might trigger a full *Monroe–Farrell* inquiry, but later tells the court that he is now satisfied with his counsel or no longer desires new counsel, the court need not continue further into the matter." *Id.* at 840 (citation omitted). We see no material difference between *McKenzie* and this case. Moreover, at the September 22 hearing the court offered appellant the only relief that a favorable *Monroe–Farrell* ruling would have provided, namely, an opportunity to obtain new counsel—which appellant flatly rejected ("I want to keep Mr. Page"). The court then continued the case for trial until the following January, giving Mr. Page ample time to prepare. We hold accordingly that appellant would not have been prejudiced even if he had properly presented and preserved a *Monroe–Farrell* claim.

### III

Next, appellant contends that the trial court improperly denied his motion to suppress the gun that was seized during what he regards as an unlawful stop. He argues that the police, alerted only by Ms. Simmons' "surmises or gossip," did not have "articulable suspicion" to conduct an investigative *Terry* stop.[8] He also argues that "what occurred inside the barber shop was an arrest ... not a *Terry* stop, and

[that] the trial court committed reversible error in not finding it to have been an arrest without probable cause." We disagree and hold that the officers had reasonable suspicion to conduct a *Terry* stop and frisk. Once they found a gun in appellant's pocket, they had probable cause to arrest him. *See Nixon v. United States*, 870 A.2d 100, 105 (D.C.2005) (defendant's statement, during a *Terry* stop, that he had "one little bag" in his possession gave police officer probable cause "at that instant" to arrest him for drug possession and search his person).

"Our review of the trial court's disposition of a motion to suppress 'is limited.'" *White v. United States*, 763 A.2d 715, 719 (D.C.2000) (citations omitted). "We must defer to the trial judge's findings of evidentiary fact ... and view all reasonable inferences therefrom ... in favor of sustaining the trial court ruling." *Id.* (citations and internal quotation marks omitted). "Essentially, our role is to ensure that the trial court has a substantial basis for concluding that no constitutional violation occurred." *Lawrence v. United States*, 566 A.2d 57, 60 (D.C.1989) (citation omitted). Any ruling on an issue of law, however, is reviewed *de novo. White*, 763 A.2d at 720.

Furthermore, "[t]he trial court's determination as to whether the officer had reasonable suspicion ... is a mixed question of law and fact." *Umanzor v. United States*, 803 A.2d 983, 991 (D.C. 2002) (citations omitted). We must examine the totality of circumstances surrounding the seizure under the well-established standard set forth in *White* (and many other cases):

A police officer must have a reasonable, articulable suspicion that criminal activi-

---

8. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

ty is afoot before that officer lawfully can stop (or seize) an individual without that person's consent. In that regard, the Fourth Amendment requires some minimal level of objective justification for making the stop. Thus, it is insufficient for a police officer to merely articulate an inchoate and unparticularized suspicion or hunch.

*White,* 763 A.2d at 720 (citations and quotation marks omitted); *see also Umanzor,* 803 A.2d at 991–992. The information known to Officer Hammett in this case went well beyond anything that might be called a hunch or an "unparticularized suspicion."

■ Officer Hammett's involvement began when a woman he had known for many years, Ms. Simmons, unexpectedly came up to him when he was off duty with the tip that the person responsible for Mr. Holland's murder was nearby. She approached Officer Hammett on her own and specifically asked whether he was familiar with "the homicide at 11th and O [Streets] a couple of days ago." When Officer Hammett replied that he was, she told him that "the guy who did the shooting is around the corner."

This court has often recognized that "a citizen informant, particularly one who identifies herself, is a 'more credible source than a paid police informant.'" *Davis v. United States,* 759 A.2d 665, 670 (D.C.2000). By "identifying herself, [Ms. Simmons] exhibited a willingness to be held accountable for the information she had provided the police." *Parker v. United States,* 601 A.2d 45, 49 (D.C.2000). Moreover, when she pointedly asked Officer Hammett whether he was aware of the recent homicide, her account gained credibility. As the trial court stated:

> There was a witness who purported to ... know about the homicide, and ... directly that there was a homicide on 11th and O several days before the event. So there clearly was a homicide involved, with a shooting, obviously the most serious crime that we know, and that involved ... a firearm of some sort.

In light of Ms. Simmons' communication to Officer Hammett, the trial court held, and we agree, that the police had a "reasonable articulable suspicion" to stop and frisk the man "around the corner" that she was talking about.

Officer Hammett and Ms. Simmons then drove around the neighborhood looking for that man. After she spotted him, the officer tailed appellant while calling his dispatcher on the radio with a request for backup assistance, and also to confirm that she had contacted the police earlier that day. In addition, Officer Hammett spoke with Detective Smith, who corroborated Ms. Simmons' story that she had previously gone to the police and implicated appellant in the shooting of Mr. Holland. Moments later Officer Hammett saw a group of young men on the street, and Ms. Simmons again identified appellant as one of those men. Thus, as the trial court emphasized, the "critical evidence" was known to the police before appellant was stopped.[9]

■ Officer Hammett's requested backup assistance approached quietly.

9. As the government states in its brief, at this point the police had reasonable suspicion based on "the fact that (1) a known citizen gave Officer Hammett a face-to-face report that appellant had told her that he killed Holland; (2) Officer Hammett confirmed that she had previously provided the same or similar information to the detective in charge of the investigation; (3) the citizen was concerned enough to accompany the officer while he searched for appellant; and (4) the citizen reported that she had just seen the killer around the corner."

When the first police car arrived, Officer Hammett had already parked his own car out of sight of appellant and his friends and was walking down the street toward the barber shop, where the other young men were also congregating. He directed the police car toward them, and it pulled in front of the barber shop. As that car was being parked, Officer Hammett walked toward the shop, displaying his police badge, which was on a chain around his neck (apparently because he was off duty and not in uniform). Upon seeing the officers approaching, appellant separated himself from the group, entered the barber shop, and took a seat. Officer Myhand then got out of the police car and joined Officer Hammett on the sidewalk, and together they entered the barber shop. Contrary to appellant's claims, the testimony shows that only Officers Hammett and Myhand entered the barber shop while another officer remained standing near appellant's friends outside; furthermore, no weapons were ever drawn.[10] The officers asked appellant to stand up and place his hands on the wall. When he did so, Officer Myhand frisked him and found a gun in his pocket. That discovery gave the police probable cause to arrest appellant.

Given the facts available to the officers "at the moment of seizure," we hold that they were warranted in the "reasonable suspicion" that appellant was connected with the recent homicide of Kareem Holland. *See Umanzor,* 803 A.2d at 992. The trial court was of the same view:

> [T]he critical question in these kinds of cases is, in light of the totality of the circumstances, when viewed from the perspective of a prudent and experienced police officer, was the degree of

force deployed ... necessary to neutralize the potential for harm here.

> In these circumstances, it seems to me that *the police had reasonable articulable suspicion that Mr. Gamble was involved in the homicide....* [A]nd understanding that the homicide involved the use of a firearm, it was certainly reasonable to stop Mr. Gamble and make a limited inquiry of him. The fact that the homicide involved a firearm, certainly from a police officer's viewpoint, it was not only reasonable, but almost required that they not only protect themselves, but protect others who might—particularly in a barber shop.... [A]nd it would be prudent for a police officer to, at the very least, conduct a patdown. [Emphasis added.]

On these facts, with knowledge that an armed homicide had occurred three days earlier and that appellant had been pointed out and identified as the shooter, the officers had—at the very least—reasonable suspicion to conduct a patdown of appellant. The officers' actions were "justified at [their] inception" and were "reasonably related in scope to the circumstances which justified the [police] interference in the first place." *In re D.A.D.,* 763 A.2d 1152, 1155 (D.C.2000). Viewing all the facts and inferences in the light most favorable to sustaining the trial court's ruling, *id.* at 1155, we hold that the motion to suppress was properly denied.

### IV

Appellant contends that the trial court erred in three evidentiary rulings which now entitle him to reversal of his conviction. In the trial court, however, he failed to challenge any of these rulings, and thus

---

**10.** Appellant states in his brief that "[m]ultiple officers cornered Mr. Gamble in a small barber shop, allegedly with guns drawn." The brief also states that "one [officer] was supposedly set up at the door to prevent escape." Appellant has not cited any testimony to back up these assertions, and there is no evidence in the record to support them.

we must find plain error in order to reverse. *See United States v. Olano*, 507 U.S. 725, 736–737, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc). We find no plain error in any of the three instances; indeed, we find no error at all.

### A. *Alleged Hearsay Testimony*

Appellant contends that at the pre-trial suppression hearing, the court admitted certain hearsay statements during the direct testimony of Officer Hammett as he related the circumstances surrounding appellant's arrest. The officer recounted what Ms. Simmons said when she approached him as he waited (off-duty) in line inside a liquor store, where he had gone to buy a lottery ticket. He then described his own actions in going to look for the suspect and those of Officer Myhand in the moments leading up to the arrest. Asserting that "hearsay includes both words and actions of another," appellant argues that this testimony by Officer Hammett should have been excluded as hearsay. We disagree.

■■■ "It is fundamental that an out-of-court statement is not hearsay if it is offered for a purpose other than to prove the truth of the matter asserted." *Perritt v. United States*, 640 A.2d 702, 704 (D.C. 1994). The testimony about what Ms. Simmons told the officer was not offered to prove the truth of the matters asserted in those statements; rather, it was presented to demonstrate to the court why the police had reasonable suspicion to stop appellant and frisk him. Moreover, the statements regarding Officer Myhand's actions were merely descriptive of the investigation and thus were not subject to a hearsay challenge. As we said in *Perritt*, "[e]vidence outlining the background of an investigation is admissible as non-hearsay." *Id.* at

705 (citations omitted). Appellant concedes that he never objected to this testimony, but even if he had, such evidence is generally admissible at pre-trial suppression hearings anyway. *See Mitchell v. United States*, 368 A.2d 514, 518 (D.C. 1977) ("because the rules of evidence normally applicable in criminal trials do not apply with full force in suppression hearings before a judge, 'reliable' hearsay generally would be admissible"). No error, plain or otherwise, arose from the admission of the officer's testimony.

### B. *Prior Gun Possession*

■■ Appellant contends that the court erred in ruling before trial that the government could elicit testimony from Mr. McCoy that he had seen appellant with a "chrome-plated .380 [pistol] with a black handle" "a couple of weeks" before the murder. At trial Mr. McCoy testified that at the crime scene he saw appellant holding a gun matching the same description. Appellant did not object to the testimony about appellant's prior possession of the gun, either when the government first announced its intention to present it or later when McCoy testified before the jury, so we review its admission only for plain error. We find no error whatsoever.

■■ Appellant seems to be contending that the testimony about appellant's prior gun possession was impermissible evidence of "other crimes." In so contending, however, he misconstrues well-established case law. "[A]n accused person's prior possession of the physical means of committing the crime" is relevant and admissible because it offers "some evidence of the probability of his guilt." *Coleman v. United States*, 379 A.2d 710, 712 (D.C.1977); *accord, e.g., McConnaughey v. United States*, 804 A.2d 334, 339 (D.C.2002); *Jackson v. United States*, 623 A.2d 571, 587 (D.C. 1993). Not only was the testimony admis-

sible, but Mr. McCoy's description established the "requisite link" that the gun he saw earlier was the same gun used in the crime. *See Stewart v. United States,* 881 A.2d 1100, 1111–1112 (D.C.2005); *McConnaughey,* 804 A.2d at 338–339; *King v. United States,* 618 A.2d 727, 729–730 (D.C. 1993). Indeed, the challenged testimony in this case was more closely connected to appellant than evidence that we have held to be admissible in other cases. *See, e.g., McConnaughey,* 804 A.2d at 338–339 (testimony of prior sighting that occurred eleven months earlier was admissible); *Johnson v. United States,* 701 A.2d 1085, 1092 (D.C.1997) (photograph depicting gun used in crime admissible even though it was more than one year old); *see also Morton v. United States,* 87 U.S.App. D.C. 135, 136, 183 F.2d 844, 845 (1950) (testimony of two witnesses who saw a gun on the defendant's bed two weeks before the murder was admissible despite the absence of any proven connection between that gun and the murder weapon). We find no error by the trial court in admitting Mr. McCoy's testimony about the gun.

## C. *Bias*

Appellant's third claim of plain error is that the court prevented his counsel from questioning his own witness, Ronnie Coley, about his belief that Ms. Simmons was a paid government informant and limited counsel's examination only to Coley's awareness of her reputation for truthfulness. Appellant contends that this was an impermissible restriction because counsel "is permitted to inquire into a witness's knowledge of bias that could potentially have affected [her] actions or words."

■ This argument lacks merit for several reasons. First, appellant's counsel never characterized any of Coley's expected testimony as relevant to any asserted bias on the part of Ms. Simmons. Rather, counsel said that he intended to offer it to show that, given Ms. Simmons' "interaction and her behavior with the police in and about the neighborhood," it was unlikely that appellant either told her of his intention to kill Mr. Holland or discussed the murder with her afterwards.[11] Thus, if appellant is merely claiming that counsel failed to argue that Coley's testimony (regarding Ms. Simmons' status as an informant) was admissible to show bias on her part, then that contention is better understood as an ineffective assistance claim. Because appellant did not raise this objection either at trial or in his § 23–110 motion, it would now be barred, for a party cannot raise new claims of ineffectiveness on appeal that were not first raised in the trial court. *See McKenzie,* 659 A.2d at 840 n. 5; *Young v. United States,* 639 A.2d 92, 97 n. 8 (D.C.1994); *Jones v. United States,* 512 A.2d 253, 259 n. 8 (D.C.1986).

■ In any event, counsel asked Ms. Simmons on cross-examination if she had ever been a police informant, and she responded that she had not been. In light of that response, the government contends that Coley's testimony regarding Ms. Simmons was nothing more than impeachment testimony. Defense counsel, however, stated during a bench conference that Coley's testimony was not intended for impeachment. "An 'impeachment witness,' by definition, includes one who will testify that the adversary's witness has made a prior inconsistent statement, and is there-

11. At a bench conference, counsel stated that Mr. Coley "is aware that she used to be a police informant. He is aware of that." Appellant's brief, however, states that although Coley did not believe that Simmons was a paid police informant at that time, he could have testified that "she is considered to be untrustworthy and has been known to affiliate with the police."

fore less worthy of belief than if she had testified consistently." *R. & G. Orthopedic Appliances & Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 537 (D.C.1991). Therefore, if Coley's statements necessarily amounted to impeachment testimony despite counsel's stated intention otherwise, the trial court's ruling was correct because, with limited exceptions,[12] a party may not introduce extrinsic evidence to impeach a witness on collateral issues. *See Washington v. United States,* 499 A.2d 95, 101 (D.C.1985) (citing cases).

Moreover, in an abundance of caution, the court on several occasions asked counsel to proffer facts showing that Ms. Simmons was a police informant, even stating, in one instance, "If you have got a specific proffer, then I will probably allow that." Without a proffer capable of meeting this minimum threshold, however, the court would not permit any questions about Ms. Simmons' informant status (assuming she was an informant, which was never really proved) because "it is very prejudicial." On this record we find no error in the trial court's limitation of Mr. Coley's testimony.

### V

Finally, appellant maintains that he was denied the effective assistance of counsel because his retained attorney "failed to pursue potentially crucial witnesses and evidence" during the three-and-one-half-month period following the September 22 hearing, at which appellant told the court that he "want[ed] to keep" that attorney. He focuses his attention on counsel's alleged failure to pursue six supposed exculpatory witnesses.

■■■■ To establish ineffective assistance, appellant must show both deficient performance and prejudice that produced

errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The deficient performance prong requires a showing that counsel's conduct fell below a standard of "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. Because of the difficulty inherent in making such an evaluation, *Strickland* and other cases have recognized a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. Appellant therefore "must overcome the presumption that ... the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (citation omitted). We must also take into account counsel's entire performance throughout the trial, not simply an isolated act or omission. *Brewer v. United States,* 609 A.2d 1140, 1142 (D.C.1992), *cert. denied,* 506 U.S. 1068, 113 S.Ct. 1019, 122 L.Ed.2d 166 (1993). To establish prejudice, the second Strickland requirement, appellant must demonstrate that a "reasonable probability" exists—sufficient to "undermine confidence in the outcome"— that "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Appellant fails both parts of the *Strickland* test.

### A. Deficient Performance

■■■ After holding a two-day evidentiary hearing on appellant's § 23–110 motion, the court denied it, finding that counsel was "certainly a vigorous advocate for the defendant" at trial. Upon considering the totality of counsel's performance, the court concluded:

He made certainly an acceptable opening statement and closing argument.

---

**12.** *See Patterson v. United States,* 580 A.2d 1319, 1322–1323 (D.C.1990) (trial court has discretion to allow impeachment on collateral

issues "provided [the evidence] has sufficient bearing on the issues which the trier of fact must resolve").

He forcefully cross-examined witnesses. He competently litigated pretrial motions, including to suppress evidence, statements, and I believe identifications. He objected at appropriate times. He clearly called a number of witnesses, four witnesses. He presented in my view during the trial itself a professional and competent defense on the face of it. Addressing appellant's allegations about counsel's pre-trial failure to interview potentially exculpatory witnesses, the court ruled that the motion "must be rejected" because insufficient evidence had been "unearthed" after trial to support those allegations. Specifically, there was no evidence that the two witnesses who testified at the § 23–110 hearing (Barringer and Sheffield) ever communicated their knowledge to counsel [13] or that the "six ... valuable and potentially exculpatory witnesses" discussed in appellant's brief even existed. The court also expressed doubts about the credibility of the two testifying witnesses, and we must defer to those determinations.[14] *See, e.g., Barnes v. United States,* 760 A.2d 556, 559 (D.C. 2000) (citing *Johnson v. United States,* 616 A.2d 1216, 1234 (D.C.1992)). Moreover, there was no evidence that these witnesses' information, even if true, could reasonably have been discovered by the defense before or during trial.

With respect to the six potentially exculpatory witnesses, the trial court was understandably doubtful that they "ever existed." Contrary to appellant's assertion that six witnesses had been "identified"

and were "valuable" and that there was "no doubt that these witnesses would have served a beneficial purpose at trial," they were mentioned only obliquely in Mr. Aronstamn's letter of December 22, 1999, to appellant, a letter devoid of any names or other specific information. As the court noted, they might have "existed" merely "for the purposes of leverage, financial leverage," because Mr. Aronstamn, an investigator hired by his attorney, wanted to convince appellant to pay his outstanding debt. At the § 23–110 hearing, only three possible witnesses were named, and appellant presented no evidence that six exculpatory witnesses even existed. Nor were Ms. Anderson, Mr. Page, and Mr. Aronstamn—persons who might have been able to assist in determining the identities of the alleged exculpatory witnesses—called by appellant's counsel to testify at the hearing. We are mindful that the "decision to call witnesses is a judgment 'left almost exclusively to counsel,' " *Oliver v. United States,* 832 A.2d 153, 158 (D.C. 2003) (citation omitted), but we question the wisdom of not putting any of these individuals on the stand in light of this particular claim. We agree with the trial court that, without record support, appellant offered nothing more than "speculation that other witnesses could have presented evidence." From the record before us, we cannot conclude that trial counsel's performance was constitutionally deficient.

## B. *Prejudice*

█ Even if appellant could successfully establish deficient performance, he

---

13. The court had "serious questions regarding the credibility of testimony that whatever information they had was given to the defense camp at all. . . . Here, it's not the implausibility per se of the testimony, it's the implausibility that this information was communicated to the defense." The court also was suspicious of the claim that the witnesses were interviewed by a "Mr. Johnson" when there was no further evidence identifying this man.

14. The court noted that Sheffield was a good friend of appellant, admitted using PCP shortly before the shooting, told police at the scene that he did not see the shooter, and made an inconsistent statement about talking with appellant. Barringer's testimony was undermined by the fact that he never reported anything to the police.

could not make the prejudice showing required under *Strickland.* The court stated that "the Government had a very strong case against Mr. Gamble," which included testimony about an extended drug dispute between appellant and Mr. Holland before the murder, statements by appellant of his intention to kill Holland, eyewitnesses to the murder, admissions by appellant after the crime, a ballistics match between the bullet that killed Holland and the .380 caliber pistol found in appellant's pocket only a few days after the murder, a false alibi that appellant gave the police, and the fact that family members were subpoenaed and unwillingly provided testimony contradicting the false alibi. Furthermore, the court to some extent discredited the testimony of the two witnesses who testified for appellant at the § 23–110 hearing because they raised credibility concerns—a determination that we have no reason to overturn. *See, e.g., Barnes,* 760 A.2d at 559.

Granting, as we must, substantial deference to the court's factual findings, we hold that appellant has not satisfied either *Strickland* requirement. He has not presented evidence to rebut the presumption that counsel's performance reflected sound trial strategy. Moreover, we are not persuaded that a reasonable probability exists that the outcome of the trial would have been different if the two witnesses who testified at the § 23–110 hearing had also testified at trial or if the evidence presented in their hearing testimony had been communicated to trial counsel.

## VI

The two judgments of conviction and the order denying the § 23–110 motion in both cases are all *Affirmed.*